<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MODERN ORTHOPAEDICS OF NJ,<br><br>Plaintiff,<br><br>v.<br><br>PREMERA BLUE CROSS,<br><br>Defendant. | Case No. 2:25-cv-01087 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss filed by Defendant Premera Blue Cross ("Premera"), seeking to dismiss Plaintiff Modern Orthopaedics of NJ's ("Modern Ortho") Amended Complaint. (ECF No. 22.) Modern Ortho filed and opposition to Defendant's Motion alongside a cross-motion to confirm the arbitration award. (ECF No. 27.) Premera filed a reply brief, responding to Modern Ortho's opposition. (ECF No. 28). Having reviewed and considered the submissions filed in connection with the motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause appearing, Defendant's Motion to Dismiss is **GRANTED**.

I.    **BACKGROUND**

A.    **Factual Background**

For the purpose of this motion to dismiss, the Court accepts the factual allegations of the Amended Complaint as true and draws all inferences in the light most favorable to the Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory*

*Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

Assuming all facts alleged by the Plaintiff are true. Two years ago, an orthopedic surgeon, Dr. David Ratliff, performed surgery on a patient insured by Premera at St. Joseph's University. (Modern Ortho's Brief in Opposition to Motion to Dismiss and in Support of Cross Motion to Confirm Arbitration (ECF No. 27-1) at 3.) Dr. Ratliff was employed by Modern Ortho. (*Id.*) Though St. Joseph's University was an in-network facility, Modern Ortho is an out-of-network healthcare provider. (*Id.*) This discrepancy led to the party's current payment dispute. (*Id.*) at 4.

After treating the patient, Modern Ortho sent a bill for $18,203.00 to Premera. Premera approved a single payment of $1,489.38. (Compl. (ECF No. 1) at ¶¶ 8–9.) Pursuant to the federal No Surprises Act ("NSA"), 42 U.S.C. § 300gg-111(c)(1), the parties proceeded to negotiate payment. (ECF No. 27-1 at 3.) They failed to reach an agreement within the statutory thirty (30) day negotiation period, so Modern Ortho initiated Independent Dispute Resolution (IDR) proceedings in an attempt to recoup what it felt it was owed. (*Id.*)

Modern Ortho prevailed in the IDR, and was awarded $18,000, minus the $1,489.38 Premera had already paid. *Id.* at 4. It should be noted, Premera never agreed to be bound by the IDR, nor had it agreed to arbitrate any portion of the disputed coverage. (ECF No. 1 ¶ 25.) Likewise, there is no network contract between the parties. (ECF No. 27-1 at 3.) Premera therefore refuses to pay the $16,510.62 Modern Ortho attempts to collect. (*Id.* at 4.) Modern Ortho brought this lawsuit to confirm its IDR award.(*Id.*).

### B.    Procedural History

Modern Ortho filed a complaint before this court on February 7, 2025 seeking to enforce an award from a prior IDR. (ECF No. 1.) On May 27th, 2025 Premera responded to the complaint

by moving to dismiss, arguing the Court lacks the power to hear this complaint under the Federal Arbitration Act ("FAA"), as the complaint alleged. (Premera's Brief in Support of Motion to Dismiss (ECF No. 22-2).) Modern Ortho opposed this motion to dismiss on July 21, 2025, arguing that the FAA did provide a basis to confirm the arbitration award and—even if it did not—the NSA itself implied a private right of action for the Court to enforce the award. (ECF No. 27-1 at 2.) Therefore, Modern Ortho simultaneously filed a cross motion to confirm the arbitration award. (ECF No. 27.) Premera responded, supporting its motion to dismiss and opposing the new cross motion on August 4, 2025. (Premera's Response in Support of Motion to Dismiss Complaint (ECF No. 28).)

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme

Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

While, generally, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (emphasis added) (quoting *Shaw*, 82 F.3d at 1220). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

### B.  Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenging the Court's subject matter jurisdiction asserts the Court lacks "authority or competence to hear and decide the case before it." *Northlight Harbor, LLC v. United States*, 561 F. Supp. 2d 517, 520 (D.N.J. 2008) (citing CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 5B FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed. 2004)). It requires a plaintiff to bear the burden of pleading that jurisdiction is appropriate. *Id.* at 521; *see also Wright v. N.J./Dep't of Educ.*, 115 F. Supp. 3d 490, 495 (D.N.J. 2015) ("It is well-settled that the plaintiff bears the burden of establishing subject matter jurisdiction in order to defeat a motion under Rule 12(b)(1)."). In considering dismissal for lack of subject matter jurisdiction, a district court's focus is not on whether the factual allegations entitle a plaintiff to relief, but rather on whether the court has jurisdiction to hear the claim and grant relief. *See Maertin*

*v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 445 (D.N.J. 2002) (citing *New Hope Books, Inc. v. Farmer*, 82 F. Supp. 2d 321, 324 (D.N.J. 2000)).

The court must determine "whether [it is] dealing with a facial or factual attack to jurisdiction. If . . . facial [], the court looks only at the allegations in the pleadings and does so in the light most favorable to the plaintiff." *United States ex rel. FLFMC, LLC v. TFH Publ's, Inc.*, 855 F. Supp. 2d 300, 304 (D.N.J. 2012) (quoting *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 191 n.4 (3d Cir. 2011)). A factual attack, on the other hand, "concerns not an alleged pleading deficiency, but rather the actual failure of [plaintiff's] claims to comport with the jurisdictional prerequisites." *Id.* (quoting *United States ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). Moreover, the standard of review for a facial Rule 12(b)(1) attack is the same as one under 12(b)(6). *Id.*

The Third Circuit has "repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits." *Id.* at 348. "[D]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Id.* at 350 (alteration in original) (quoting *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 899 (3d Cir. 1987)).

## III.  DECISION

The NSA is a federal law passed in 2020 intended to prevent patients from receiving "surprise medical bills," as a result of being taken to an out-of-network healthcare provider. *See GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, No. CV226614 2023 WL 5815821, at *2 (D.N.J. Sept. 8, 2023). "[T]he [NSA] limits the amount an insured patient will pay

for emergency services furnished by an out-of-network provider and for certain non-emergency services furnished by an out-of-network provider at an in-network facility." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528, 533 (E.D. Tex. 2022) (citing 42 U.S.C. §§ 300gg-111, 300gg-131, 300gg-132).

The NSA protects patients by relieving them of liability to pay for the procedure beyond their ordinary in-network insurance payments and instead has the provider and the insurer negotiate or dispute the proper payment among themselves. 42 U.S.C.A. § 300gg-111(c)(1)(A). When an insurer makes an initial payment or denial of payment, the insurer and the healthcare provider must negotiate the proper payment for the next thirty-days. *Id.* If the parties are unable to agree on the amount due, the statute provides a four-day period for either party to submit the dispute to the Secretary of Health and Human Services ("HHS"), initiating an IDR. *Id.* § 300gg-111(c)(1)(B).

Under the NSA, the HHS Secretary, alongside the Secretaries of Labor and Treasury, have the responsibility to certify independent entities with "sufficient medical, legal, and other expertise" to serve as referees to the IDR. *Id.* § 300gg-111(c)(4)(A). When initiating an IDR, the parties may agree upon a specific referee or have the HHS assign one to them. *Id.* § 300gg-111(c)(4)(F). Upon selection of the referee, that entity has the power to issue a binding decision as to what the insurer owes—though the parties may still settle their dispute at any time before the decision is rendered. *Id.* § 300gg-111(b)(5)(D).

The IDR process is designed to be as streamlined as possible and is therefore necessarily limited. The process involves baseball-style dispute resolution, where the referee directly selects one party's offer as the award. *Id.* § 300gg-111(b)(5). To determine the proper award, the referee considers the following:

1. The qualifying payment amounts for comparable items or services in the same region, in the same year;

2. The level of training, experience, quality, and outcomes of the provider;

3. The market share held by the provider or that of the insurer in the region;

4. The complexity involved in providing the service or item; and how acutely it was required by the patient;

5. The teaching status, case mix, and scope of services of the provider;

6. Demonstrations of good faith efforts, or lack thereof, or the provider and insurer to enter into a network contract; and

7. Contracted rates between the insurer and the facility where the item or service was furnished, if such rates were in effect within the last four (4) plan years.

*Id.* §§ 300gg-111(c)(5)(C)(i)–(ii). The referee is restricted from considering other factors, namely the "usual and customary charges, the amount that would have been billed . . . had [the NSA] not applied, or the payment or reimbursement rate . . . payable by a public payor," such as Medicare or Medicaid. *Id.* at § 300gg-111(c)(5)(D).

The IDR does not conduct in-person hearings or conduct briefings like a court would. Instead, each party submits its offer alongside additional information, which it believes supports its suggested award amount. *Id.* at § 300gg-111(c)(5)(A). The referee picks one award, in its entirety, to enforce, which is binding and must be made within 30 days. *Id.* at § 300gg-111(c)(6). There are no appeals from this decision, and it is shielded from all judicial review. *Id.* § 300gg-111(c)(5)(E).

Premera acknowledges that it is subject to an IDR award, however it maintains that the NSA does not create a right of action for Modern Ortho to enforce the award in federal court. (ECF

No. 22–2 at 14.) Premera also argues Section 9 of the FAA similarly does not provide Modern Ortho the right to have this Court confirm its IDR award, as the award is not from arbitration. (*Id.* at 11.)

Modern Ortho claims there are three independent reasons the court should enforce the IDR award. First, it argues that the IDR is, in essence, an arbitration award like any other and should be enforced under Section 9 of the FAA. (ECF No. 27-1 at 3.) Second, Modern Ortho claims that even if the IDR is not an enforceable arbitration, the structure and its mandatory language of the FSA imply a cause of action to collect the amount awarded in an IDR. (*Id.*) Finally, Modern Ortho suggests that because Premera has not moved to vacate the IDR decision in over a year, that decision must be enforced. (*Id.* at 17.)

## A. Section 9 of the FAA does not provide a basis for this Court to confirm Modern Ortho's award

Section 9 of the FAA sets forth the process by which a prevailing party in an arbitration can have his award enforced by the Courts. 9 U.S.C. § 9. The basic process is as follows: If the parties to the arbitration agree upon a court of competent jurisdiction then any party to the arbitration may move that court to confirm the award within a year of it being granted; however if there no court specified in the arbitration agreement, parties may confirm the award with a court in the same jurisdiction that the arbitration occured. *Id.*

Modern Ortho's argument that this law, combined with the NSA, provides him with a right to confirm his award before this Court is misplaced. First, the IDR process is not an arbitration, as the parties never agreed to the process. Second, though the NSA references Section 10 of the FAA, it never incorporates Section 9—or any other section—which would allow judicial enforcement of awards. Finally, even if the NSA implicated Section 9, this Court would not have jurisdiction under the FAA because Section 9 does not provide an independent basis for federal question jurisdiction.

**1. The NSA is not an arbitration and there is no enforceable arbitration award.**

The NSA's IDR panels provide a similar service to private, third-party arbitrators when compared to litigation. In both, an independent panel—separate from the judicial system—examines evidence submitted by the parties in a streamlined process to determine the proper award. 42 U.S.C. §§ 300gg-111(c)(5)–(6). These similarities are heightened by the fact the judiciary has a very limited role—imported from the FAA itself—in reviewing decisions by the panel for misconduct. *Id.* at §§ 300gg-111(c)(5)(E)(i)(II) (incorporating paragraphs (1) through (4) of 9 U.S.C. §10(a)).

Modern Ortho argues Congress must have implied Section 9 of the FAA is the proper enforcement vehicle because the IDR process incorporates these similar elements to arbitration. *See generally* 42 U.S.C. § 300gg-111; (*see also* ECF No. 27-1 at 9.) Yet, as Premera points out (ECF No. 22-2 at 6–7), while there are superficial similarities between the IDR and arbitration, they are premised on fundamentally different authorities. *See Jeffrey Farkas, M.D., LLC v. Horizon Blue Cross Blue Shield of New Jersey*, 2025 WL 1860241, at *4 (E.D.N.Y. July 2, 2025) (quoting *Med-Trans Corp. v. Cap. Health Plan, Inc.*, 700 F. Supp. 3d 1076, 1083 (M.D. Fla. 2023) (explaining that arbitration draws its authority from contract, rather than statute)).

Section 9 of the FAA empowers courts to confirm arbitration awards and is the primary enforcement mechanism for arbitration awards. However, at times, Congress has seen fit to incorporate Section 9 in other statutes to allow for judicial enforcement. *See e.g.,* 5 U.S.C. § 580(c) ("A final award is binding on the parties to the arbitration proceeding, and may be enforced pursuant to sections 9 through 13 of title 9.") In other words, Congress knows how to incorporate Section 9, yet it chose not to in the NSA. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Kapral v. United States*, 166 F.3d 565, 578 (3d Cir. 1999) (Alito J., concurring) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Here, Congress chose to include particular language—incorporating Section 10 of the FAA to allow the Courts to vacate IDR awards—but omitted any parallel language allowing the Court to confirm an IDR award. The Court reads this choice as deliberate, reflecting the markedly different legal and policy rationales for arbitration and IDR respectively.

For the same reason, the Court rejects Modern Ortho's argument that, even if Section 9 is not incorporated, it applies because an IDR is itself an arbitration. (ECF No. at 8.) On its face, Section 9 applies only where parties "in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration." 9 U.S.C. § 9. Premera points out, correctly, that there is no contract between the parties let alone an agreement to arbitrate payment disputes through the IDR process. (ECF No. 22-2 at 6.) As other courts have noted, although the IDR is often "called arbitration and the IDR entities arbitrators . . . [t]he NSA's IDR . . . is statutorily compelled." *Med-Trans Corp. v. Cap. Health Plan, Inc.*, 700 F. Supp. 3d 1076, 1083 (M.D. Fla. 2023). Whereas the "FAA reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67, (2010); *see also Jeffrey Farkas, M.D., LLC* 2025 WL 1860241, at *4 (holding that, unlike the NSA, "the FAA, assumes an agreement or contract to arbitrate . . . [a]nd without an agreement to arbitrate . . . there can be no jurisdictional hook based on federal contractual rights," under Section 9).

These differences pervade the IDR and arbitration processes. By way of example, to begin arbitration the parties must have an unambiguous agreement to arbitrate; conversely, an IDR is limited to parties that have no agreement whatsoever and have failed to find alternative way to

resolve their dispute. *Compare* 9 U.S.C. § 2, *with* 42 U.S.C. § 300gg-111(b)(1)(B). If one party refuses, or otherwise fails, to submit to arbitration other parties to the agreement have special access to the courts to compel arbitration. 9 U.S.C.A. § 4. Whereas a party's failure to submit to an IDR simply results in an effective default.[1] 42 U.S.C.A. § 300gg-111(c)(5)(A)(i). An arbitration can take place before any entity the parties agree may handle their dispute. 9 U.S.C. § 5. But the referees to an IDR are subject matter experts certified by the HHS Secretary specifically to handle payment disputes. 42 U.S.C.A. § 300gg-111(c)(4)(A)(i).

As for the process itself, the IDR is—by statute—a highly-restricted process. The parties are given a single opportunity to provide the referee with supporting documents and evidence. *Id.* § 300gg-111(b)(5). As noted by Premera, there is no opportunity for briefing, hearing, or appeal beyond that provided by § 300gg-111(c)(5)(E)(i)(II).[2] (ECF 22-2 at 3.) It is possible for arbitration to be similarly restrictive, and indeed some courts have drawn a parallel between this procedure and "baseball style arbitration." *Guardian Flight LLC v. Aetna Life Ins. Co.*, No. 3:24-CV-00680-MPS, 2025 WL 1399145, at *2 (D. Conn. May 14, 2025); *see also Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271, 273 (5th Cir. 2025). However, is it far more common for arbitration to be a robust process, involving discovery, hearings and a limited possibility for appeal. Am. Arb. Ass'n, *Payor Provider Rules and Mediation Procedures* 28 (2022) (Rules R-23–R-41), https://www.adr.org/rules-forms-and-fees/healthcare/ [https://perma.cc/R7MN-G3GA] (rules for arbitrating disputes related to healthcare). Even the awards available are drastically different, as the IDR referee "select[s] one of the offers submitted . . . to be the amount of payment." 42 U.S.C.

---

[1] Because the IDR referee is limited to choosing one of the offers submitted to it, if a party fails to submit an offer the referee is required to impose the only offer it received.

[2] This section incorporates 9 U.S.C. § 10, and prohibits the Court from reviewing IDR decisions, except for misconduct.

§ 300gg-111(c)(5)(A)(i). Arbitrators generally have no such limitation and instead have "broad discretion to grant any remedy or relief," including equitable relief. *Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr., P.A.*, 98 F.4th 463, 469 (3d Cir. 2024) (citation modified) (quoting Am. Arb. Ass'n, *Commercial Arbitration Rules and Mediation Procedures* 28 (2013) (Rule 47)) (noting arbitrator's ability to impose treble damages or demand specific performance of a contract).

Stated simply, the IDR process is far too different from arbitration for this Court to conclude that Congress implied for the FAA to govern the IDR process in general. The only parallels are the incorporation of Section 10 and the use of "baseball-style dispute resolution," a rare arbitration procedure. *Health Care Serv. Corp.*, 140 F.4th at 273. Modern Ortho has not provided a single case from any court holding that an IDR is arbitration or enforced under Section 9. (ECF No. 27-1 at 8.)

### 2. Section 9 of the FAA does not provide a basis for Federal Jurisdiction

Even if Section 9 of the FAA was incorporated into the IDR process, this court will still not have jurisdiction. In its complaint, Modern Ortho cites Section 9 as the sole basis for this Court's jurisdiction. (ECF No. 1 ¶ 4 and ECF No. 27-1 at 11.) However, despite being a federal law, Section 9 "bestow[s] no federal jurisdiction" and instead the plaintiff requires "an independent jurisdictional basis" on the face of the complaint. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008); *see also Badgerow v. Walters*, 596 U.S. 1, 8 (2022) (holding Sections 4, 9, and 10 of the FAA "do not themselves support federal jurisdiction," despite "authoriz[ing] parties . . . to file specified motions before the court").

While Modern Ortho recognizes this limitation, it argues the Court still has jurisdiction because the "claims in the underlying arbitration" arise out of "federal law independent of the

FAA," namely the NSA. (ECF No. 27-1 at 11.) But looking through the claim to enforce an arbitration award and determining jurisdiction on the basis of the arbitration is the very type of "look through" jurisdiction the Supreme Court rejected in *Badgerow v. Walters*. 596 U.S. 1, 11 (2022).

Arbitration, at its base, is a method of settling claims—resolving a legal dispute through contract as opposed to litigation. *See Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (finding that agreements to arbitrate are "contract[s] to settle" between the parties); *see also* 9 U.S.C. § 2 (stating that arbitration clauses are an agreement "to settle by arbitration any controversy arising thereafter"). And the enforcement of legal settlements "even settlements of federal claims— typically involve only state law, like disagreements about other contracts." *Badgerow*, 596 U.S., at 9.

Looking through the arbitration to the underlying claim "is a jurisdictional outlier," unique to petitions to compel arbitration under Section 4 of the FAA. *Id.* at 14. There, it is mandated by the specific language of Section 4, where the petition may be brought in any court that would have jurisdiction over the controversy, "save for [an] agreement" to arbitrate. 9 U.S.C. § 4; *see also Vaden v. Discover Bank*, 556 U.S. 49, 53 (2009) (holding that the "save for" clause permits a "federal court [to] look through a § 4 petition"). This language acknowledges that the resolution of the dispute by contract would usually divest the district court of jurisdiction and is notably absent from Sections 9 and 10. 9 U.S.C. §§ 9–10. "Without that statutory instruction, a court may look only to the application actually submitted to it in assessing its jurisdiction." *Badgerow*, 596 U.S. at 5.

For the foregoing reasons, Modern Ortho's claim under Section 9 of the FAA is **DISMISSED**.

### B. The No Surprises Act does not imply a right for judicial enforcement of IDR awards

#### 1. The NSA provides Modern Ortho a right to be paid the outstanding amount

Recognizing this court lacks jurisdiction under the FAA, Modern Ortho raises, for the first time in its brief, the prospect of this Court having jurisdiction under the NSA itself. However, the NSA does not contain any language creating a cause of action or right to have the IDR award confirmed by this Court. *See generally* 42 U.S.C. §§ 300gg-111–112. Indeed, the only role contemplated for the federal courts in the NSA is the ability to vacate an award granted due to misconduct. 9 U.S.C. § 10(a)(1)–(4).

Modern Ortho acknowledges this and argues instead the NSA's cause of action is implied by the "text and structure of the NSA" and "strong, mandatory language regarding payment obligations." (ECF No. 27-1 at 10 (quoting *Guardian Flight LLC v. Aetna Life Ins. Co.*, 2025 WL 1399145, at *20)). "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The Third Circuit "employ[s] a two-step inquiry for determining whether a private right of action exists under a federal statute: (1) whether Congress intended to create a personal right in the plaintiff; and (2) whether Congress intended to create a personal remedy for that plaintiff." *McGovern v. City of Philadelphia*, 554 F.3d 114, 116 (3d Cir. 2009) (citing *Sandoval*, 532 U.S. at 286; *Three Rivers Ctr. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 421 (3d Cir.2004)). "Only if we can affirmatively answer both parts of the inquiry will [courts] hold that an implied private right of action exists . . . [a] plaintiff asserting a violation . . . must address both aspects." *Id.*

According to Modern Ortho, a single term answers both prongs of this inquiry. (ECF No. 27-1 at 10.) Under the NSA, the decision of the referee "shall be binding on the parties involved." 42 U.S.C.A. §§ 300gg-111(c)(5)(E)(i)(I). Another part of the statute states payment "shall be made

directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id.* at (c)(6). These instances of mandatory language are persuasive, as they clearly impose an obligation on Premera to pay the outstanding amount to Modern Ortho.

Premera's response is less than compelling. It argues "the undisputed purpose of the []NSA was to protect *patients* from . . . *providers*;" it believes that the concern of Congress "was not in making sure that those providers continue to reap the rewards of their practices by shifting the payment source." (ECF No. 28 at 7–8.) Under Premera's reading, the NSA is, to some degree, a punitive law intended to end the "predatory billing practices of out-of-network providers." (*Id.* at 8.) Under this lens any lack of enforcement mechanism is simply reflective of Congress' real intent—to allow insurance companies to pay-what-they-choose for medical services. (*Id.*) The Court is not persuaded.

First, Premera's position is straightforwardly a policy argument. (*Id.* at 6.) Premera does not—and cannot—cite to a single case to support the argument that the NSA does not confer upon Modern Ortho a right to be paid the amount awarded under the IDR. (ECF No. 22-2 at 11 – 12; ECF No. 28 at 6–8.) Instead, Premera selectively cites to parts of the congressional record to show Congress intended to protect patients from surprise billing. H.R. Rep. 116-615.

Yet Modern Ortho has never denied that patients were intended to be beneficiaries, even the primary beneficiaries, of the NSA. (ECF No. 27-1 at 4.) But it would be irrational to conclude from a single goal that Congress gave no thought to the balance of equities between insurers and providers—or that it decided to resolve the balance entirely in the favor of insurers. Looking at the sections of the congressional record which pertain to the IDR process reveals that, while Congress was intent on "taking the consumer out of the middle of surprise billing disputes," the IDR process was intended to "establish a fair payment amount" and "strike[] an appropriate balance between

. . . various stakeholders." H.R. REP. 116-615(I), 55–58. The IDR was also Congress's vehicle to combat the "exorbitant . . . surprise billing practices," *id.* at 55, Premera complains of. (ECF No. 28 at 8).

The language of the NSA clearly supports this right. As Modern Ortho correctly points out, the statute is replete with language imposing obligations upon the non-prevailing party before an IDR. (ECF No. 27-1 at 10.) Under the statute, the $16,510.62 IDR award "shall be binding" upon Premera, and the "payment required . . . shall be made directly to [Modern Ortho] not later than 30 days after" the award was granted, and furthermore Premera "shall . . . pay[] all fees charged by [the IDR referee]." 42 U.S.C. § 300gg-111(b)–(c). "Statutory 'shall pay' language often reflects congressional intent to create both a right and a remedy." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (quotation modified); *see also Bowen v. Massachusetts*, 487 U.S. 879, 923 (1988) (Scalia, J., dissenting) ("[A] statute commanding the payment of a specified amount of money by the United States impliedly authorizes (absent other indication) a claim for damages in the defaulted amount.").

There is no plausible argument that Congress intended to allow insurers like Premera to simply ignore the "binding" outcomes of the IDR. 42 U.S.C. § 300gg–111(c)(5)(E)(i). Modern Ortho has a right to be paid. The question is whether the Court may properly enforce this right.

### 2. The inclusion of administrative enforcement, negates any implied private right of action

Having established its right to be paid, Modern Ortho understandably looks to the courts to vindicate that right. It argues, absent judicial intervention, there is "no other enforcement mechanism to ensure payors pay providers what they are due." (ECF. No. 27-1 at 11 (quoting Brief for United States as Amici Curiae Supporting Plaintiffs-Appellants, *Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271 (5th Cir. 2025) (No. 24-10561) ("U.S. Amicus Brief in

17

*Guardian Flight*")).) Premera argues that this is a mere "policy preference" on the part of Modern Ortho but makes minimal effort to identify any existing enforcement mechanism. (ECF No. 28 at 6 & 8.) However, this is no mere policy dispute. Were the NSA to create a right without an apparent remedy, that itself is strong evidence that Congress intended judicial enforcement. *Maine Cmty. Health Options*, 590 U.S. at 324. Yet, the Court finds that Congress did create a robust system of administrative enforcement and therefore this Court has no jurisdiction to confirm Modern Ortho's award.

Here, there are two issues which together prevent the Court from vindicating Modern Ortho's award. First, the statute provides for administrative enforcement remedies. Even if those remedies are not currently being applied, as Modern Ortho alleges (ECF No. 27-1 at 13), the mere presence of "agency enforcement creates a strong presumption against implied private rights of action that must be overcome." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 305 (3d Cir. 2007). This presumption cannot be overcome, because the plain language of the statute limited "judicial review" other than to vacate awards gained through misconduct. 42. U.S.C. § 300gg-111(c)(5)(E).

"The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. For its part, Premera only makes a conclusory claim that "Congress left the enforcement of the []NSA to the [HHS]." (ECF No. 28 at 8.) But it cites no authority to support this conclusion, and points to no element of the NSA which could be read as leaving enforcement to the HHS. (*Id.*) However the Court has "special obligation to satisfy itself of its own jurisdiction." *United States v. Touby*, 909 F.2d 759, 763 (3d Cir. 1990), *aff'd*, 500 U.S. 160 (1991) (citing *McNasby v. Crown Cork and Seal Co.,* 832 F.2d 47, 49 (3d Cir.1987)). Premera is incorrect; the primary enforcement authority for the NSA lies with *state* administrative agencies. 42 U.S.C. § 300gg-22(a)(1). The HHS only takes over enforcement

where it "determine[s] . . . a State has failed to substantially enforce a provision (or provisions) in this part or part D," part D being the part of Title 42 which, among other things, requires compliance with the IDR process and awards. *Id.* at § (a)(2).

However, states do not have authority over all types of healthcare product. So, the NSA has several modes of enforcement mechanisms, reflecting the variety of health plans and different regulatory bodies which govern them. The foremost enforcement provision is contained within the Act itself, 42 U.S.C. § 300gg-22, which give the HHS an oversight role to the State agencies which regulate "health insurance issuers."[3] Typically, it is the state agencies which possess the authority to regulate and enforce regulations against the health insurance providers. *Sec. & Exch. Comm'n v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 69 (1959) ("[T]he regulation of 'insurance,' though within the ambit of federal power, has traditionally been under the control of the States.") It is therefore state administrative agencies who are the first line of enforcement contemplated under the NSA. 42 U.S.C. § 300gg-22(a). States may enforce IDR awards through their own laws, in collaboration with the HHS, or any of their own laws which have a process for resolving payment disputes—as these laws were not supplanted by the NSA. U.S. Gov't Accountability Off., GAO-24-106335, Roll Out of Independent Dispute Resolution Process for Out of Network Claims Has Been Challenging, at 11 (2023) (Official Report to Congress) ("Gov't Accountability Off. R."). The exact enforcement mechanisms and penalties will vary state-by-state, in accordance with applicable state law.

---

[3] Health insurance issuers are insurance companies, services, or organizations which are "licensed to engage in the business of insurance in a State and which is subject to State law," they are distinct from "group health plans." 42 U.S.C. § 300gg-91(b)(2).

The HHS plays an oversight role to the states and other federal agencies. *Id.* Pursuant to the NSA, the HHS set up an office within the Centers for Medicare and Medicaid Services ("CMS"), which is tasked with administering the IDR process. 42 U.S.C. § 300gg-111(a)(2)(B). While states have "primary responsibility for regulating health insurance and exercise primary enforcement authority," the CMS is the one to certify and oversee the IDR referees across the country. *Id.* at § (c)(4); Gov't Accountability Off. R. at 10. Part of the role of the CMS is to receive and direct complaints pertaining to non-compliance with the NSA. *Id.* at 36. When a complaint is filed, the CMS "reviews the complaint to determine whether CMS, another federal agency, or a state insurance regulator has jurisdiction over the complaint," in no instance does the CMS contemplate judicial enforcement of claims under the NSA. *Id.* Aside from direct enforcement, the state agencies and the HHS are equally empowered to conduct audits of insurers and providers alike to ensure compliance with the NSA, including the IDR process. 42 U.S.C. § 300gg-111(a)(2)(A). However, in the event a State is unable, or unwilling, to enforce compliance with any part of the NSA, the HHS may assume primary responsibility for enforcing the NSA. *Id.*; 42 U.S.C. § 300gg-22(a)(2).[4] When assuming primary responsibility for enforcement, the HHS has the power to impose civil monetary penalties against non-complying parties up to a "$100 for each day for each individual with respect to which such a failure occurs." *Id.* § (a)(2)(C)(i).

Unlike individual health insurance, group health plans are regulated under federal authority. This authority is split between three agencies: the HHS, the Department of Labor ("DOL"), and the Department of the Treasury ("Treasury") (collectively, "the Departments"). The DOL and the Treasury have joint enforcement authority for private employer-sponsored group

---

[4] HHS also has the primary responsibility to regulate "non-federal governmental plans, such as those sponsored by state and local government employers," and therefore has "primary enforcement authority," at all times. Gov't Accountability Off. R. at 10.

health plans under the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1002 *et seq.* The NSA was also codified under the DOL's authority to protect employee benefits. 29 U.S.C.A. § 1185e. Though the DOL is focused on harms to employees, the NSA codifies enforcement authority over the entire IDR process. *See id.* § (c). The DOL has the broadest enforcement powers of the Departments, with sweeping authority to initiate investigations and civil enforcement proceedings. 29 U.S.C. §§ 1132(a)(3) & 1134(a)(3). Under these authorities, the DOL has been responding to individual complaints relating to the IDR process and late or non-payments. Gov't Accountability Off. R. at 39–40.

The Treasury has a unique oversight role for health care plans governed by ERISA. Like ERISA, 29 U.S.C. § 1191b(a), the NSA was codified into the Internal Revenue Code, as part of the Treasury's responsibility to enforce the NSA. 26 U.S.C. § 9816. This section incorporates compliance with the IDR process—including the timely payment of awards. *Id.* § (c)(6). Where a group health plan is failing to comply with the requirements of these acts, the Treasury has the authority to levy an increasingly heavy excise tax for each day the party remains out of compliance. 26 U.S.C. § 4980D(b)(1). These provisions broadly parallel the HHS's own enforcement powers. *Compare id.*; *with* 42 U.S.C. § 300gg-22. The Court therefore finds that Congress, in making these administrative enforcements, *did* provide a specific method for Modern Ortho to seek relief.

Modern Ortho, and the authorities it cites, does not contend otherwise. In its brief, Modern Ortho admits "[t]he NSA vests the Department of Labor and the Secretary of Health and Human Services the power to enforce the procedures of the IDR process," and instead argues because the statute "did not confer *exclusive* jurisdiction concerning the confirmation of NSA awards upon administrative agencies[,] this Court has the authority to confirm NSA awards." (ECF No. 27-1 at 2 & 10 (emphasis added).) However this argument reverses the standard, Congress need not

expressly create administrative exclusivity; "reference to [administrative] enforcement combined with the absence of other enforcement provisions, creates a presumption that [administrative] enforcement of the statute is exclusive." *Wisniewski*, 510 F.3d at 305.

To overcome this presumption, Modern Ortho—and every authority on which it relies—points to the same list of concerning statistics regarding unpaid IDR awards. Without question, the issues it raises are concerning. (ECF No. 27-1 at 13.) Under the NSA, "low pay, late pay or no pay scheme[s have] become a widespread business practice." *Guardian Flight LLC v. Aetna Life Ins. Co.*, No. 3:24-CV-00680-MPS, 2025 WL 1399145, at *3 (D. Conn. May 14, 2025) (citation modified). According to the Government Accountability Office, "issuers have regularly failed to pay determination awards upon losing an IDR process dispute" to the point where for some "the majority of the payment determinations . . . remain unpaid," because, despite the HHS's power to impose "civil monetary penalt[ies]" under the act, it has so far refrained from doing so. Gov't Accountability Off. R., at 32 & 36–37. The DOJ, in its amicus brief before the Fifth Circuit, argues current administrative enforcement procedures are "not comprehensive in multiple respects," leading to consistent under payment by insurers. U.S. Amicus Brief in *Guardian Flight* at 14. Notably, each of these focus on the allegedly "inadequate" state of the current enforcement mechanisms; none dispute the point that Congress did, in fact, create an administrative enforcement regime. (ECF No. 27-1 at 10.)

Modern Ortho also argues "[t]he law states that Plaintiff . . . must instead avail itself of the NSA's IDR process and procedures to secure payment," and it would therefore be left entirely helpless without judicial enforcement of the IDR. (*Id.* at 19.) Setting aside the possibility of administrative enforcement, this is a misreading of the statute. The NSA only "prevents emergency service providers from holding a *patient* liable for the balance of a bill," it says nothing that would

preclude a provider from bringing a suit under traditional state-law causes of action. *Ass'n of Air Med. Servs. v. U.S. Dep't of Health & Hum. Servs.*, No. 21 Civ. 3031, 2023 WL 5094881, at *1 (D.D.C. Aug. 9, 2023) (emphasis added). For federal law to preempt state law, there must be a specific "[c]onflict . . . where compliance with both . . . is a physical impossibility," or Congress must have "intended federal law to occupy the field . . . [with t]he intent to displace state law altogether." *Lozano v. City of Hazleton*, 724 F.3d 297, 303 (3d Cir. 2013). Far from expressing preclusive intent, the NSA's preemption clause is clear:

> [The NSA] shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with individual or group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement of [the NSA.]

42 U.S.C. § 300gg-23. The IDR is an opt-in process, it provides an alternative, streamlined route to determine the amount owed between the parties—it does not displace traditional state-law remedies like unjust enrichment. *Kennedy v. UnitedHealth Grp. Inc.*, No. 25 CIV. 432, 2025 WL 1725147 at *8–9 (S.D.N.Y. June 20, 2025) (holding breach of contract and unjust enrichment claims for failure to pay for patient emergency care were not preempted by the NSA).

Congress chose to omit Section 9 of the FAA, or indeed any other mechanism, by which this Court may confirm Modern Ortho's award. A "fundamental principle of statutory interpretation [is] that absent provisions cannot be supplied by the courts." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019). On the basis of these alleged policy failures, Modern Ortho asks the Court to "invent a cause of action to confirm [its] award under the NSA." *Jeffrey Farkas, M.D., LLC* 2025 WL 1860241, at *14–15. This, the Court cannot do. *Sandoval*, 532 U.S. at 287 ("[Without statutory authority, a Court] may not create [a cause of action] no matter how desirable that might be as a policy matter, or how compatible with the statute.")

23

### 3. Statutory language forbidding judicial review bars judicial enforcement

Modern Ortho objects that even if administrative enforcement is present, it is "wholly inadequate" because "[t]he NSA does not prescribe a specific enforcement process for payment of the awards." (ECF No. 27-1 at 12.) Therefore, it reasons, if Congress did not confer "exclusive jurisdiction . . . upon an administrative Court," the Act "carries an implicit judicial enforcement mechanism." (*Id.* at 8.) Aside from reversing the standard for finding an implied right of action, *Wisniewski*, 510 F.3d at 305, Modern Ortho ignores clear statutory preference for exclusive administrative jurisdiction.

Under 42 U.S.C.A. § 300gg-111(c)(5)(E), "[a] determination of a certified IDR entity . . . shall not be subject to judicial review, except [to vacate for misconduct under] section 10(a) of Title 9." According to Modern Ortho, we may safely set this language aside because they do not "request . . . judicial review but . . . judicial enforcement." (ECF No. 27-1 at 12.) They do not provide a single authority supporting this "important distinction." (*Id.*) Indeed, as other courts have found, it is a "distinction without a difference." *Health Care Serv. Corp.*, 140 F.4th at 275. "Review" is a capacious term—it does not refer exclusively to attempts to overturn but to the Court's "[p]lenary power to *direct and instruct an agent or subordinate* including the right to remand, modify, or vacate any action by the agent or subordinate, or to act directly in place of the agent or subordinate." *Review*, Black's Law Dictionary (12th ed. 2024) (emphasis added). Supreme Court precedent is likewise clear that where a "statute provides for judicial review of [an] arbitrator's decision," or in this case forbids it, the statute is referring to "an action in the district court to *enforce*, vacate, or modify the award." *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 611 (1993) (discussing judicial review or ERISA arbitration) (emphasis added). The Court cannot interpret language forbidding

judicial review except to vacate an award to mean forbidding judicial review except to vacate *or enforce* an award.

 *GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, is not to the contrary. No. CV226614, 2023 WL 5815821 (D.N.J. Sept. 8, 2023). Though Modern Ortho points to Judge McNulty's opinion in a case where the court confirmed an IDR award, Modern Ortho ignores the Court's actual basis for jurisdiction in that case. *Id.* at *7. The Petitioner in *GPS of New Jersey* was not petitioning the Court to confirm the IDR award—it was petitioning the court to vacate the award granted to the Respondent. *Id.*

 Under 42 U.S.C. § 300gg-111(c)(5)(E), a party who is unsuccessful before the IDR may petition seek judicial review of the decision under the standards described in Section 10 of the FAA, which it incorporates by reference. The Respondent, having already been haled into Federal Court, then made a cross-motion to confirm the award. *GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821 at *2.

 As previously stated, the degree of judicial review permitted by Section 10 is minimal and "focuses on misconduct rather than mistake." *GPS of New Jersey MD, P.C. v. Aetna, Inc.*, No. CV2205487, 2024 WL 414042, at *3 (D.N.J. Feb. 5, 2024) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350–51 (2011). If the Petitioner is unable to overcome this "high hurdle," the NSA is clear—the award is "final and binding" and therefore "must be confirmed." *GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821 at *10.

 But the Court only had jurisdiction to confirm the award because the Petitioner attempted to vacate under § 300gg-111(c)(5)(E), otherwise the NSA is quite clear that the award "shall not be subject to judicial review." This is the same situation that the court in *Guardian Flight LLC v. Aetna Life Ins. Co.*, the only case to support Modern Ortho's argument, concluded would provide

the federal courts jurisdiction—even if the NSA provided no private right of action. No. 3:24-CV-00680, 2025 WL 1399145, at *8 (D. Conn. May 14, 2025) (Without a private right of action, federal courts would only have jurisdiction in the "rare instance in which an award was challenged <u>un</u>successfully." (emphasis original)).

The District of Connecticut found this to be an "absurd result." *Id.* at *8. The Court respectfully disagrees. As previously discussed, the Court finds there are other enforcement mechanisms available to Modern Ortho. *Cf. supra.* at 18–20. With that in mind, it is not absurd for Congress to shield the IDR processes from judicial review while leaving the courts an oversight role to prevent gross misconduct. In that instance, where the petitioner has asked the court to overturn the IDR award and lost, it cannot then complain if the court then enforces an otherwise valid and binding award. *See e.g.*, *GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL at 10; *Worldwide Aircraft Servs. Inc. v. Worldwide Ins. Servs., LLC*, No. 8:24-CV-840, 2024 WL 4226799, at *3 (M.D. Fla. Sept. 18, 2024) (granting a cross-motion to confirm after the insurer moved to vacate the award and removed to federal court). Indeed, every single case other than *Guardian Flight LLC v. Aetna Life Ins. Co.*, Modern Ortho cites in support of its motion to confirm (ECF No. 27-1 at 1), involves a cross motion to confirm in response to a petition to vacate. *See GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL at 10; *Worldwide Aircraft Servs. Inc.*, 2024 WL 4226799 at *3.

For the foregoing reasons, the Court joins the majority of other courts in holding that the NSA does not contain an implied right of action to enforce IDR awards.

### C. Premera did not waive the ability to move to dismiss by choosing not to petition the Court to vacate the award

Finally, Modern Ortho contends "[p]ursuant to Section 9 of the FAA . . . the court ***must*** grant such an order unless the award is vacated, modified, or corrected as prescribed by the FAA."

(ECF No. 27-1 at 17 (emphasis original).) The Court has already addressed Modern Ortho's arguments regarding Section 9 of the FAA and found that it has no bearing on this case. *See supra* at 11. However, Modern Ortho uses this to advance a new argument—that Premera is required to move to vacate the award within a prescribed period after the IDR determination, or it waives all right to challenge the award. (*See* ECF No. 27-1 at 17–18); *see also* 42 U.S.C. § 300gg-111(c)(6).

Modern Ortho provides no authority in support of this theory, and its argument is misplaced on two counts. First, a party seeking to vacate an IDR is not compelled to petition within the 30 days before payment is due. *Id.* § 300gg-111(c)(5) (prescribing no set period to bring the petition). Second, and more fundamentally, Premera is not moving to vacate or otherwise challenge the validity of the IDR award—it is challenging Modern Ortho's method of enforcement. (ECF No. 22-2 at 5.) The Court therefore finds Premera did not waive its argument to dismiss the case.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Confirm Arbitration is **DENIED** and Defendant's Motion to Dismiss is **GRANTED**. An appropriate order will follow.


Date:  November 3, 2025                          */s/ Brian R. Martinotti*
                                                 **HON. BRIAN R. MARTINOTTI**
                                                 **UNITED STATES DISTRICT JUDGE**